# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KRISTI ASBURY,
    Plaintiff,

Case No. 1:18-cv-365
Dlott, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**REPORT AND
RECOMMENDATION**

Plaintiff Kristi Asbury brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying Plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 10), the Commissioner's response in opposition (Doc. 16), and plaintiff's reply

(Doc. 17).

## I. Procedural Background

Plaintiff filed her applications for DIB and SSI in August 2015, alleging disability since

December 15, 2014, due to spondylolisthesis in the back, depression, Post Traumatic Stress

Disorder ("PTSD"), anemia, Type II diabetes, chronic pain, anxiety, subluxation in neck, and

memory issues. The applications were denied initially and upon reconsideration. Plaintiff,

through counsel, requested and was granted a *de novo* hearing before administrative law judge

("ALJ") Reuben Sheperd. Plaintiff and a vocational expert ("VE") appeared and testified at the

ALJ hearing on October 6, 2017. On December 20, 2017, the ALJ issued a decision denying

plaintiff's DIB and SSI applications. This decision became the final decision of the Commissioner when the Appeals Council denied review on March 27, 2018.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

ALJ Sheperd applied the sequential evaluation process and made the following findings

of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act
> through March 31, 2018.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December
> 15, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: Obesity; diabetes
> mellitus, with neuropathy; lumbar degenerative disc disease; asthma; and
> depressive, anxiety, attention deficit hyperactivity, personality, and post-
> traumatic stress disorders, with a history of substance use/abuse/dependence (20
> CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments
> that meets or medically equals the severity of one of the listed impairments in 20
> CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525,
> 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. The [plaintiff] has the residual functional capacity to perform sedentary work
> as defined in 20 CFR 404.1567(a) and 416.967(a); however, the [plaintiff]
> requires a "sit/stand option," defined as the ability to alternate between sitting

and standing positions at will. She can never climb ladders, ropes, or scaffolds, she can never work at unprotected heights or with moving mechanical parts, and the [plaintiff] cannot operate a motor vehicle as a part of her duties. The [plaintiff] can frequently balance, but she can no more than occasionally climb ramps/stairs, stoop, kneel, crouch, or crawl. She can tolerate occasional[] exposure to humidity, wetness, extreme temperatures, dust, odors, fumes, gases, poor ventilation, or similar respiratory irritants. Mentally, the [plaintiff] is limited to simple, routine tasks involving no more than simple work-related decisions; she is limited to frequent rather than constant interaction with the general public, and she can tolerate few changes in her routine work setting.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. The [plaintiff] was born [in] . . . 1969 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and can communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404 Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from December 15, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-31).

---

[1] Plaintiff's past relevant work was as a finance manager, a sedentary, skilled position; a customer service representative, a sedentary, semi-skilled position; and an administrative assistant and driving instructor, both light, semi-skilled positions. (Tr. 29, 83-84).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations such as order clerk (40,000 jobs in the national economy), charge account clerk (88,000 jobs in the national economy), and call center operator (50,000 jobs in the national economy). (Tr. 30, 86).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §
405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by
substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.
Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*,
478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence
as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,
402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229
(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a
preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In
deciding whether the Commissioner's findings are supported by substantial evidence, the Court
considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the
disability determination. Even if substantial evidence supports the ALJ's conclusion that the
plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails
to follow its own regulations and where that error prejudices a claimant on the merits or deprives
the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).
*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was
otherwise supported by substantial evidence where ALJ failed to give good reasons for not
giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific errors**

On appeal, plaintiff alleges that the ALJ erred: (1) by finding that plaintiff did not meet and/or equal the requirements of Listings 1.04A and 1.04C for disorders of the spine; (2) by fashioning a residual functional capacity ("RFC") that does not fully account for plaintiff's mental limitations; and (3) by failing to properly evaluate the opinion of plaintiff's treating psychiatrist, Dr. Michael Cerullo, M.D. (Docs. 10, 17).

**1. Step Three Error**

*a. Step Three of the sequential evaluation*

Plaintiff alleges that the ALJ erred at step three of the sequential evaluation process by finding that her degenerative disc disease did not meet or equal § 1.04 of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. At the third step in the disability evaluation process, a claimant will be found disabled if her impairments meet or equal a listing in the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listings describe impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). A claimant must satisfy all of the specified criteria to "meet" a listing. *Id.*; *Rabbers*, 582 F.3d at 653. *See also Brauninger v. Comm'r. of Soc. Sec.*, No. 18-3495, 2019 WL 2246791, at *5 (6th Cir. Feb. 25, 2019) (citing *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990)). In

addition, the regulations require that the requisite abnormal findings must be established over a period of time and "established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00(D). *See also Irvin v. Comm'r of Soc. Sec.*, No. 1:12-cv-837, 2013 WL 3353888, at *10 (S.D. Ohio July 3, 2013); *see also Brauninger*, 2017 WL 5020137 at *21 ("[O]ccasional or intermittent findings of decreased reflexes or changes in sensation of the lower extremities are not sufficient to satisfy Listing 1.04(A).")

The ALJ must "actually evaluate the evidence," compare it to the requirements of the relevant listing, and provide an "explained conclusion, in order to facilitate meaningful judicial review" of a step three finding. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). If a claimant's impairment does not meet a listed impairment, the claimant will still be found disabled at step three if her impairment is the medical equivalent of a listing. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To be the medical equivalent of a listed impairment, a claimant's impairment must be "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). An impairment is medically equivalent to a listing if medical findings related to the impairment are at least of equal medical significance to the findings necessary to meet the Listings. 20 C.F.R. §§ 404.1526(b)(1), 416.926(b)(1). *Tipton v. Comm'r of Soc. Sec.*, No. 2:14-cv-1209, 2015 WL 3505513, at *5 (S.D. Ohio June 3, 2015) (Report and Recommendation), *adopted,* 2015 WL 3952347 (S.D. Ohio June 29, 2015). The claimant bears the burden of presenting "medical findings equal in severity to *all* the criteria for the one most similar listed impairment" to establish equivalency. *Zebley*, 493 U.S. at 530 (emphasis in the original). The ALJ is required to compare the medical evidence with the

components of listed impairments in considering whether the condition is equivalent in severity to the medical findings for a listed impairment. *See Lawson v. Comm'r of Soc. Sec.*, 192 F. App'x 521, 529 (6th Cir. 2006). When performing this analysis, the ALJ must "consider all evidence in [the] case record about [the claimant's] impairment(s) and its effects on [the claimant] that is relevant to this finding." 20 C.F.R. §§ 404.1526(c), 416.926(c).

Under Sixth Circuit law, the court may uphold a conclusory step three finding if the ALJ's findings at other steps of the sequential evaluation provide a sufficient basis for the ALJ's step three finding. *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x 359, 366 (6th Cir. 2014) (citing *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) ("looking to findings elsewhere in the ALJ's decision to affirm a step-three medical equivalency determination, and finding no need to require the ALJ to 'spell out every fact a second time'")). Even if adequate support for the ALJ's step three finding is lacking, the error is harmless where the plaintiff has not shown that her impairments met or medically equaled the severity of any listed impairment. *Id.* at 366 (citing *Reynolds,* 424 F. App'x at 416). *See also Layton ex rel. B.O. v. Colvin*, No. 12-12934, 2013 WL 5372798, at **8, 15 (E.D. Mich. Sept. 25, 2013).

### b. The ALJ's step three analysis

Plaintiff argues that the ALJ's step three finding is not supported by substantial evidence because the ALJ did not properly evaluate her physical impairments under Listing 1.04. Plaintiff's counsel expressly informed the ALJ at the oral hearing that plaintiff was not contending that her impairments met a listing. (Tr. 46-47). The ALJ nonetheless considered at step three whether plaintiff's spinal impairment satisfied the criteria of Listing 1.04. The ALJ

found that "the medical evidence fails to establish the severity of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis required by Listing 1.04," and the record did not document that plaintiff's spinal impairment resulted in "sensory or reflex loss, *or* in severe burning or painful dysesthesia resulting in the need for changes in position or posture more than once every 2 hours, *or* in an inability to ambulate effectively, as that term is defined in Section 1.00(B)(2)(b) of the listings." (Tr. 18) (emphasis in the original).

Plaintiff alleges that contrary to the ALJ's finding, she has produced evidence that satisfies every requirement of Listings 1.04A and 1.04C. (Doc. 10 at 6-11). Plaintiff argues that in determining otherwise, the ALJ did not fulfill his duty to evaluate the evidence, compare it to Listing 1.04, and give an explanation for his conclusion. (*Id.* at 10, citing *Reynolds*, 424 F. App'x 416). Plaintiff contends that the ALJ's entire analysis consists of one sentence, which is: "As the record also fails to document the necessary findings, the claimant's spinal impairment is likewise lacking in listing-level severity." (Doc. 10 at 10, citing Tr. 18). Plaintiff alleges the case must be remanded because the ALJ did not "articulate a meaningful discussion of the Listing or related criteria." (*Id.* at 10).

### c. *Listings 1.04A and 1.04C*

Listing 1.04A covers "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04. The disorder of the spine must be accompanied by:

9

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). . . .

*Id.* Thus, to satisfy paragraph A, plaintiff must demonstrate she suffers from a disorder of the spine and show: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness); (4) sensory or reflex loss; and, if the lower back is involved, (5) positive straight leg raise test, in both the sitting and supine positions. *Id*. *See also* Social Security Acquiescence Ruling (AR) 15-1(4), 2015 WL 5697481, at *4 (Sept. 23, 2015).

To satisfy Listing 1.04A, plaintiff must produce evidence of simultaneous, sustained symptoms of nerve root compression set forth in the that listing. AR 15-1(4), 2015 WL 5697481, at *5. The policy as set forth in AR 15-1(4) requires:

[F]or a disorder of the spine to meet listing 1.04A at step three in the sequential evaluation process, the claimant must establish the simultaneous presence of all the medical criteria in paragraph A. Once this level of severity is established, the claimant must also show that this level of severity continued, or is expected to continue, for a continuous period of at least 12 months. . . .

*Id.*

On the other hand, when the listing criteria are scattered over time, wax and wane, or are present on one examination but absent on another, the individual's nerve root compression would not rise to the level of severity required by listing 1.04A. An individual who shows only some of the criteria on examination presents a different, less severe clinical picture than someone with the full set of criteria present simultaneously. To meet the severity required by the listing, our policy requires the simultaneous presence of all of the medical criteria in listing 1.04A.

*Id.*, at \*4. *See also Reed v. Comm'r. of Soc. Sec.*, 17-cv-22, 2017 WL 6523295, at \*6 (S.D. Ohio Dec. 21, 2017) (Report and Recommendation), *adopted,* 2018 WL 1522076 (S.D. Ohio Mar. 28, 2018).

This Court has affirmed ALJ decisions where the record did not show "consistent and continuous symptoms that matched all Listing 1.04A criteria for a 12-month period." *Reed,* 2017 WL 6523295, at \*6 (citing *Irvin,* 2013 WL 335388) (ALJ's conclusion that certain medical findings were not sufficiently consistent to satisfy the Listing was supported by substantial evidence, despite evidence of positive straight-leg raising test results, reduced strength and reflexes, loss of sensation, antalgic gait, spasm, and reduced range of motion); *Gully v. Comm'r of Soc. Sec.,* No. 1:16-cv 923, 2017 WL 4329632 (S.D. Ohio Aug. 3, 2017) (ALJ's decision was substantially supported where some records showed normal findings of no atrophy and normal strength and tone); *Brauninger,* 2019 WL 2246791 (some positive findings of symptoms required by Listing 1.04A were insufficient where there was no evidence of nerve root compression and other findings related to other symptoms required under the listing were normal)).

Listing 1.04C covers "Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1. An "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt.

404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). Generally, an individual is unable to ambulate effectively if she has "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . ." *Id.*

To ambulate effectively requires the capability to "sustain[] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living" and "the ability to travel without companion assistance to and from" a job or school. *Id.*, § 1.00(B)(2)(b)(2). Non-exhaustive examples of ineffective ambulation include the following: "the inability to walk without the use of a walker, two crutches or two canes[;] the inability to walk a block at a reasonable pace on rough or uneven surfaces[;] the inability to use standard public transportation[;] the inability to carry out routine ambulatory activities, such as shopping and banking[;] and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* "The inability to ambulate effectively . . . must have lasted, or be expected to last, for at least 12 months." 20 CFR Pt. 404, Subpt. P, App. § 1.00(B)(2)(a). The determination of whether an individual can ambulate effectively is made "based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c." *Id.*

d. *The ALJ's step three finding is substantially supported*

Plaintiff alleges she has established "a disorder of the spine that results in a compromise of the nerve root" with "evidence of neuro-anatomic distribution of pain and limitation of motion

of the spine." (*Id.* at 11). Plaintiff asserts that the record shows she was diagnosed with several disorders of the spine: a herniated disc, lumbar radiculopathy, lumbar spondylosis, sacroiliitis, acquired spondylolisthesis, and lumbago; the record includes MRI results with positive findings; and the medical evidence includes "severe neurological findings." (Doc. 10 at 8). While the record does document that plaintiff suffers from a severe disorder of the spine, the ALJ properly found that plaintiff's spinal impairment did not meet or equal Listing 1.04 and his finding is substantially supported by the record.

First, contrary to plaintiff's contention, the record does not document nerve root compression. Plaintiff acknowledges that MRIs showed only mild or minimal diffuse disc bulging with mild bilateral facet disease at several levels; some minimal narrowing of the spinal cord and minimal bilateral foraminal narrowing without evidence of L3 nerve root compression at L3-4; and at L5-SI, grade II anterolisthesis due to bilateral spondylosis with mild to moderate bilateral facet disease, moderate to severe left and moderate right foraminal narrowing, and a finding that:

> There *may be* compression of the left L5 nerve root. Disc/osteophyte material abuts *but does not definitely compress* the right L5 nerve root.

(Doc. 10 at 8, citing Tr. 385-86) (emphasis added). These imaging results disclose at most a possibility of nerve root compression.

Second, plaintiff has not produced evidence of simultaneous, sustained symptoms of nerve root compression set forth in Listing 1.04A as required under AR 15-1(4). Plaintiff alleges that physical examination disclosed several "severe neurological findings" which purportedly satisfy Listing 1.04A: neuro-anatomic distribution of pain; positive straight leg testing;

13

bilaterally, reduced range of motion; numbness, tingling, weakness in the legs and feet; and abnormal gait. (*Id.* at 8, citing Tr. 385, 474, 482, 486, 490, 492, 496, 498, 500, 564, 576-77, 598, 642, 606, 615, 1028, 1039, 1044, 1112, 1119, 1129, 1148, 1162-66). Though the record does document some of the positive findings required under Listing 1.04A, the findings are not consistent and are not sustained over a 12-month period so as to show plaintiff's lumbar impairment meets or equals Listing 1.04.

The earliest records plaintiff cites are those generated by Dr. Jennifer Smail, M.D., an orthopedic surgeon who first saw plaintiff prior to the alleged onset date in July 2014. (*See* Tr. 439-41). Plaintiff complained of gradually worsening back pain with flare-ups. (Tr. 439). Plaintiff described the pain as non-radiating and associated with leg numbness at the top of both feet and weakness in both legs. (*Id.*). Plaintiff reported that the pain restricted her to lifting only very light weights, walking no more than 1/4 mile, sitting no more than 1/2 hour, and standing no more than 10 minutes. (Tr. 439-40). Dr. Smail reviewed plaintiff's July 10, 2014 MRI and diagnosed plaintiff with acquired spondylolisthesis, grade 2 spondylolisthesis, foraminal stenosis of the lumbosacral region, and radiculopathy of the leg. (Tr. 440-41). Dr. Smail opined that plaintiff would ultimately need surgery. (Tr. 441).

Plaintiff initially saw Dr. Thomas Knox, M.D., with Integrative Pain Management (IPM) two weeks later on July 25, 2014, presenting with complaints of low back and neck pain. (Tr. 480). She reported that her pain radiated to the hips bilaterally and had begun more than 5 years prior. On examination, Dr. Knox found that plaintiff exhibited a normal gait; grossly normal tone and muscle strength; some muscular restriction; normal sensation to the touch; and positive

14

straight leg lift on the right at 30 degrees. Dr. Knox diagnosed plaintiff with low back and neck pain and degeneration of lumbar disc. Dr. Knox and other providers at IPM made identical findings during office visits in August 2014 (Tr. 482); September 2014 (Tr. 486-87); December 2014 (Tr. 490); January 2015 (Tr. 492); March 2015 (Tr. 496); April 2015 (Tr. 498); and May 2015 (Tr. 500). Between August 2014 and May 2015, the treatment notes reflect that plaintiff was "[d]oing well with current medical management"; and she was "[a]ble to work" and her activities of daily living were "good." (Tr. 482, 486, 488, 490, 492, 494, 496, 498, 500).

Plaintiff was a passenger in an automobile accident in November 2014, shortly before the alleged onset date. (Tr. 435). Plaintiff followed-up with Dr. Smail's practice on November 13, 2014. (Tr. 430-36). She complained of pain and stiffness in her low back that radiated into her hips, the backs of her calves, and the bottom of her feet. On examination, Dr. Smail noted plaintiff had a short-strided gait pattern and her gait was antalgic bilaterally. She could not toe or heel walk and she could barely bend forward. Extension of her back was positive at 0 degrees, lateral bending was positive at 10 degrees to the right and at 10 degrees to the left, bilateral straight leg raising was positive, and distraction straight leg raise test was negative. (Tr. 434). Cord impingement signs were negative for both legs. (*Id*.). Dr. Smail assessed plaintiff with foraminal stenosis of the lumbosacral region and back pain. *Id.* Due to plaintiff's reports of headaches, short-term memory loss, confusion, neck pain, and vision changes, she underwent a brain MRI in December 2014 which showed a few tiny scattered foci of nonspecific hyperintense T2/FLAIR signal in the cerebral white matter. *Id.* The report notes that these are most commonly related to chronic small vessel ischemia or migraine but can also be seen with

15

demyelinating disease and changes related to remote trauma, infection, or inflammation. (Tr. 383-84). In September 2015, Dr. Smail opined that a fusion surgery was needed but plaintiff was using pain management and seeing a chiropractor for treatment. (Tr. 414-16). Dr. Smail believed that plaintiff's pain interfered with personal grooming, walking, and moderate work. (*Id.*).

Plaintiff established care at Primary Health Solutions[3] with Certified Nurse Practitioner (CNP) John Wesley Greene on April 15, 2015, when she was seen for hyperlipidemia and a preventive exam as well as gastroesophageal reflux disease, diabetes and hypertension. (Tr. 556-59). On physical examination, deep tendon reflexes and a visual overview of her four extremities were normal. (Tr. 557-58). Treatment notes dated June 4, 2015 report that plaintiff had been recently discharged from her pain management provider for spilling her pills in the toilet, and she had been picked up by another provider as of July 6. (Tr. 564). She was seeking pain management treatment in addition to treatment for diabetes and hypertension. (*Id.*). On January 26, 2016, plaintiff saw CNP Greene on follow-up for her diabetes (Tr. 700-03), and he provided a medical source statement opining that plaintiff has chronic back pain and is not capable of physical labor. (Tr. 707).

An MRI of plaintiff's lumbar spine taken in May 2015 showed stable multilevel degenerative changes in the lumbar spine; Grade II anterolisthesis of L5 on S1 due to bilateral spondylolysis; suspected impingement of the left L5 nerve root; and disc and osteophyte material which abut but do not definitely compress the right L5 nerve root. (Tr. 443-44).

---

[3] The record shows plaintiff also received primary care at Mason Family Medicine & Associates (Mason Family Medicine) during this time. (Tr. 590-607).

Plaintiff began treating with pain management specialist Dr. Jobalia Nilesh, M.D., in August 2015. (Tr. 576-77). Lumbar flexion was 20 degrees and extension was to neutral. Ankle jerks were absent bilaterally. Sensory examination did not reveal any dermatomal loss of sensation in the lower extremities. She had peripheral loss of sensation when compared to proximal and dysesthetic sensation in the feet. Right lower extremity strength was slightly reduced to 4/5 for foot dorsiflexion and knee flexion but was 5/5 for plantar function, knee flexion, and hip flexion. Plaintiff had full strength on the left side. Straight leg raise was positive bilaterally. (Tr. 576-77).

Plaintiff treated with Mason Family Medicine from June 2014 to October 2015. (Tr. 599-627). In June 2014, the treatment notes reflect that plaintiff presented for treatment with elevated blood pressure, and that she also had other conditions and "back pain[,] sharp in nature [,] non radiating pain." (Tr. 615). Dr. Ahmed Bayomi, M.D., reported that plaintiff's musculoskeletal exam was normal. He diagnosed her with lumbago and indicated he would obtain an x-ray of the lumbar spine. (Id.). He prescribed 800 mg of Ibuprofen three times per day for low back pain and referred her to pain management. (Tr. 609). In March 2015, plaintiff complained of recurrent vomiting and numbness in her feet. (Tr. 606). Plaintiff's symptoms included back pain, but her physical musculoskeletal exam was "normal." (Tr. 607). She was assessed with neuropathy, lumbago, hypertension, and diabetes mellitus Type 3, uncomplicated and controlled. (Id.). In May 2015, plaintiff presented to Dr. Bayomi for a refill of her pain medications after having been dismissed from Dr. Knox's practice. (Tr. 603-604). Her musculoskeletal exam was normal and Dr. Bayomi refused to refill plaintiff's oxycodone

prescription, instead advising plaintiff to wait until she saw a pain management physician as scheduled in July. (Tr. 604). In July 2015, plaintiff presented for follow-up of anxiety and a refill of Klonopin. (Tr. 601-02). The next month, plaintiff complained of balance issues and back and foot pain. (Tr. 598). Her musculoskeletal exam was normal. (Tr. 599). Her Neurontin dose was increased to treat her neuropathy symptoms. (*Id.*).

Plaintiff cites only a handful of records for the two-year period between October 2015 and September 2017 to show she experienced symptoms that met Listing 1.04A. (Doc. 10 at 8, citing Tr. 1028, 1039, 1044, 1112, 1119, 1129, 1148, 1162-66). These records include few objective findings related to the 1.04A requirements. Plaintiff received epidural steroid injections for a herniated lumbar disc without myelopathy in September, October, and November 2015. (Tr. 1161-63). At the end of November, the "worst of [plaintiff's] pain" was related to her "diabetic neuropathy." (Tr. 1164). Dr. Jobalia reported that plaintiff's medications "continue to have a consistent effect" on plaintiff's pain. (*Id.*). By May 2016, plaintiff reported she was "trying to exercise on a regular basis," as she was "doing well" overall. (Tr. 1167). In June 2016, plaintiff reported that her "pain medication keeps things at a tolerable level." (Tr. 1168). Her diagnoses at that time were herniated cervical disc, lumbar spondylosis, diabetic neuropathy, and lumbar radiculopathy. (*Id.*). In late June, August, September, and October 2016, Dr. Jobalia did not make any objective findings related to plaintiff's spinal conditions. (Tr. 1160, 1169-1171). In September, he reported that oxycodone was working well for her and that a back brace was "helping her quite a bit as far as her functional abilities." (Tr. 1160). He noted in October

that plaintiff was "having a lot of neuropathic pain in her feet [which] is from her diabetes." (Tr. 1171).

Plaintiff presented at the emergency room three times in March and April of 2017. (Tr. 1028-1048). On March 3, 2017, she went to the emergency room complaining of bilateral foot pain that had increased over the past week with numbness, tingling, and burning which was exacerbated by walking. (Tr. 1028). Plaintiff denied back pain. She reported she had been treating with a pain doctor until December 2016, when she stopped seeing him because he no longer accepted her insurance. She requested pain relief. On physical examination, she had 4/5 strength in the bilateral lower extremities and decreased sensation over the calves and feet. (Tr. 1031). Neurologically, she had normal motor function and no focal deficits. On musculoskeletal exam, she had good range of motion in all major joints, no tenderness to palpation, and no major deformities. Based on her clinical presentation, it was determined that no acute imaging was needed. (Tr. 1032). The final impression was diabetic polyneuropathy associated with other specified diabetes mellitus. (*Id.*).

Plaintiff presented to the emergency room again on March 21, 2017, complaining of worsening back pain and burning, stinging pain in both feet. (Tr. 1036). Plaintiff reported that her pain was constant and stabbing. The pain did not radiate, and she had experienced the pain multiple times in the past. Plaintiff reported she usually took oxycodone for the pain but no longer had any, and she had an appointment with a new physician the following week. Her "workup" was "unremarkable." (Tr. 1039). She was given 10 oxycodone pills, instructed she would need to see her regular doctor the following week, and discharged in stable condition with

a diagnosis of (1) chronic right-sided back pain without sciatica, and (2) peripheral polyneuropathy. (*Id.*).

Plaintiff's third visit to the emergency room was on April 7, 2017. (Tr. 1044-48). Plaintiff complained of chronic back pain that radiated down the right leg, and she reported a history of neuropathy. (Tr. 1044). She had been taking Motrin and gabapentin, which were not helping her symptoms. The notes reflect that she ambulated to the emergency room. The review of systems was positive for back pain and lower extremity pain and negative for all other systems. The only musculoskeletal finding on physical examination was tenderness in the right lower sciatic region. (Tr. 1046). On neurological examination, she had normal reflexes, no cranial nerve deficit, and good light touch sensation. The final impression was chronic right-sided low back pain with right-sided sciatica. (Tr. 1048). Imaging results dated April 6, 2017 showed there had been a progression of degenerative changes at the LS level with "suspected compression of the left L5 nerve root" and that there "may also be impingement of the right L5 nerve root." (Tr. 1048).

Plaintiff treated with Dr. John Beresh, M.D., at Beresh Pain Management from April 26, 2017 to September 6, 2017 for diabetic peripheral neuropathy. (Tr. 1108-1148). She complained of pain radiating to the buttocks, legs and feet that was sharp, tingling, and constant and that improved with rest, medication, and changing positions. (Tr. 1112, 1118, 1124, 1129, 1135, 1141, 1146). Associated symptoms were numbness and tingling of the legs and feet. (Tr. 1112, 1118, 1124, 1129, 1135, 1141). She had some reduced range of motion of the right hip. (Tr. 1113, 1118, 1124, 1129, 1136, 1142, 1147). There was no atrophy. (*Id.*). Straight leg

raising test results were consistently negative (*Id.*), with rare exceptions (Tr. 1125, 1130). The notes indicate both that plaintiff had a normal station and "irregular gait," and also that she was "ambulating normally" and had a normal tandem gait test. (Tr. 1113, 1118, 1125, 1130, 1136, 1142, 1147). Her reflexes were decreased to pinprick in a stocking distribution bilaterally and were grossly intact. (Tr. 1112, 1118, 1125, 1130, 1136, 1142, 1147). She was diagnosed with lumbosacral spondylosis without myelopathy; degeneration of lumbosacral intervertebral disc; neurological disorder associated with type 2 diabetes mellitus and diabetic peripheral neuropathy; and long-term drug therapy. (Tr. 1113-1114, 1119, 1125, 1130-31, 1137, 1142-43, 1148).

Thus, the record includes scant evidence of "neuro-anatomic distribution of pain," which is "generally defined as complaints of pain directly generated by the compromised nerve." *McDaniel v. Colvin*, No. 2:14-cv-28157, 2016 WL 1271509, at *8-9 (S.D. W.Va. Mar. 31, 2016) (quoting *Cates v. Colvin*, No. 12-cv-111, 2013 WL 5326516, at *5 (N.D. Okla. Sept. 20, 2013)). (Tr. 439). Plaintiff described her back pain as non-radiating in July 2014 (Tr. 439), although Dr. Smail diagnosed plaintiff with radiculopathy of the leg at that time. (Tr. 440-41). Plaintiff complained of stiffness in her lower back and pain that radiated into her hips, the backs of her calves, and the bottom of her feet when she followed-up with Dr. Smail's practice in 2014 after her motor vehicle accident. (Tr. 430-36). The treatment notes do not include any other mention or findings of radiculopathy between July 2014 and October 2015. (Tr. 448-500, 556-58, 576-77; 589-627, 1160-71). Treatment notes from Mason Family Medicine for this time period show that plaintiff was treated for other conditions but that she also had "sharp," "non radiating" back

pain. (Tr. 615). When she presented to the emergency room on March 21, 2017, plaintiff

reported that her pain, which she had experienced multiple times in the past, "did not radiate"

and she was diagnosed with chronic right-sided back pain without sciatica. (Tr. 1036, 1039). A

few weeks later on April 7, 2017, the final impression was chronic right-sided lower back pain

with right-sided sciatica. (Tr. 1048). Subsequently, during monthly visits between April and

September 2017, Dr. Beresh diagnosed plaintiff with lumbosacral spondylosis "*without*

*myelopathy*." (Tr. 1113-14, 1119, 1125, 1130, 1137, 1142-43, 1147) (emphasis added). The

sporadic findings of neuroanatomic pain between the alleged onset date of December 2014 and

the date of the ALJ's decision in December 2017 "do not demonstrate that plaintiff's symptoms

persisted over a period of time as required by § 1.00D." *Dow v. Comm'r of Soc. Sec.*, No. 1:13-

cv-493, 2014 WL 4377820, at *5 (S.D. Ohio Sept. 4, 2014).

     The evidence likewise does not establish sustained limitation of motion. Dr. Knox found

"some muscular restriction" during office visits between July 2014 and May 2015, but he did not

identify the area of restriction or quantify the degree of restriction. (Tr. 480). Dr. Smail found

that plaintiff's range of motion was restricted after her motor vehicle accident in November

2014, but there is no evidence to show the limitation of motion persisted for a sustained period of

time. (Tr. 434). To the contrary, plaintiff's treating providers reported around this time period

that her musculoskeletal exam findings were normal. The treatment notes from Mason Family

Medicine for the period from June 2014 to October 2015 report that plaintiff's musculoskeletal

exam was "normal." (Tr. 597, 599, 602, 604, 612, 615). On musculoskeletal exam at the

emergency room in March 2017, plaintiff had good range of motion in all major joints. (Tr.

1031). The exam findings from plaintiff's emergency room visit in April 2017 do not include

limited range of motion. (Tr. 1046). Dr. Beresh found only slightly reduced range of motion of

the right hip during monthly examinations between April and September 2017. (Tr. 1113, 1118,

1124, 1129, 1136, 1142, 1147). These sporadic findings do not show that plaintiff experienced

persistent symptoms of limitation of motion as required by § 1.00D. *Dow*, 2014 WL 4377820, at

*5.

     Finally, plaintiff has not cited evidence of (1) "motor loss (atrophy with associated

muscle weakness or muscle weakness)," (2) "positive straight-leg raising test (sitting and

supine)," and (3) "sensory or reflex loss" resulting from her lumbar impairment over a sustained

period of time. There are a few isolated mentions of "weakness" in the record." *See*, e.g., Tr.

576-77 (right lower extremity strength was slightly reduced to 4/5 for foot dorsiflexion in August

2015). But "'[m]otor loss' required by Listing 1.04(A) is not the same as mere muscle

weakness." *Brauninger*, 2017 WL 5020137, at *7. To show motor loss as required by Listing

1.04, the claimant must demonstrate "atrophy associated with muscle weakness." *Miller v.*

*Comm'r of Soc. Sec.*, 848 F. Supp. 2d 694, 709 (S.D. Ohio 2011). Muscle atrophy is not

documented in the record. In fact, Dr. Beresh documented normal bulk between April and

September 2017. (*See* Tr. 1113, 1118, 1124-25, 1129-30, 1136, 1142, 1147).

     In addition, plaintiff cites only two positive straight leg test results from November 2014,

which was shortly after plaintiff's motor vehicle accident (Tr. 434), and one year later in August

2015 (Tr. 576-77). There is no indication that the tests were positive for both the supine and

sitting positions as Listing 1.04A requires. *See Miller*, 848 F. Supp. 2d at 709 (the plaintiff could

not meet Listing 1.04 where she did "not point to any positive straight leg raising tests in both the sitting and supine positions"); *Brauninger*, 2017 WL 5020137 at *7 (the plaintiff did not meet Listing 1.04 where the record did not indicate that straight leg test "was performed in both the sitting [and] supine positions" and the records reflected that testing results were not consistently positive). In addition, Dr. Smail reported that a "distraction" straight leg test in November 2014 was negative. (Tr. 434). Further, the positive results were sporadic. The only other straight leg test results reported in the record were for the period from April 2017 to September 2017, and all were negative. (Tr. 1113, 1118, 1124-25, 1129-30, 1136, 1142, 1147). Viewed in the context of the entire record, two positive straight leg test results over a two-year period are insufficient to satisfy the requirements of § 1.00D. *Dow*, 2014 WL 4377820, at *5.

Finally, the medical records repeatedly document sensory loss in plaintiff's lower extremities and some reflex loss. However, the sensory loss is explicitly attributed to peripheral neuropathy in plaintiff's lower extremities caused by plaintiff's Type 2 diabetes mellitus, not her lumbar or spinal impairments. (*See* Tr. 1171 - Dr. Jobalia reported in October 2016 that plaintiff was "having a lot of neuropathic pain in her feet [which] is from her diabetes."; Tr. 1032 - March 2017 emergency room discharge diagnosis was diabetic polyneuropathy associated with other specified diabetes mellitus; Tr. 1107-48 - Dr. Beresh diagnosed plaintiff with diabetic peripheral neuropathy).

In conclusion, no treating or examining source concluded that plaintiff met Listing 1.04A. While there were occasional findings of symptoms necessary to meet Listing 1.04A, they were not sufficiently consistent to satisfy the listing. Plaintiff did not "demonstrate a lack of

motor strength, a lack of sensory functions [due to her lumbar impairment], and a positive

straight-leg raising test, among other things" so as to establish nerve-root compression and

satisfy Listing 1.04A. *See Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 855 (6th Cir. 2011).

The ALJ's finding that plaintiff's spinal impairments did not meet all of the required elements of

Listing 1.04A is supported by substantial evidence.

   Plaintiff argues that the evidence includes findings of limitations provided by acceptable

medical source that show her impairments limit her ability to ambulate effectively, and the

requirements of Listing 1.04C are therefore satisfied. (Doc. 10 at 9). Plaintiff alleges there are

consistent findings of an inability to ambulate effectively due to abnormal gait, leg weakness,

numbness, and balance issues. (*Id.* at 9, citing Tr. 385, 415-35, 474, 577, 606, 1028, 1112, 1114,

1124-25). Plaintiff alleges that the medical source statement of Nurse Practitioner Greene and

the notes of treating physician Dr. Smail are further evidence of her inability to ambulate

effectively. (Doc. 10 at 9, citing Tr. 707, 415-35).

   Plaintiff has not shown that the ALJ erred by finding Listing 1.04C is not satisfied.

Plaintiff has not pointed to evidence that shows an inability to ambulate effectively as that term

is defined under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). The medical record

does not show that plaintiff experienced "an extreme limitation of the ability to walk; i.e., an

impairment(s) that interferes very seriously with [her] ability to independently initiate, sustain, or

complete activities." *Id.* No examining or treating provider documented an inability to ambulate

normally as that term is defined in the listing. Nurse Practitioner Greene only generally opined

that plaintiff "has chronic back pain and suffers from mental illness" and "is not capable of

physical labor or labor." (Tr. 707). He did not address plaintiff's ability to ambulate. (*Id.*). Dr. Smail vaguely concluded in September 2015, ten months after she had last seen plaintiff, that "pain interferes with . . . walking" (Tr. 414-16), and plaintiff reported in connection with a "Low Back Pain Disability Questionnaire" that she cannot walk more than one-quarter mile. (Tr. 433). This scant evidence is insufficient to satisfy the listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).

Further, although plaintiff consistently complained of numbness and tingling in her feet (Tr. 474, 606, 1028, 1112, 1124), records generated on the same dates as her reports do not document a limited ability to ambulate. To the contrary, records dated July and September 2017 report that plaintiff's ability to perform activities of daily living improved with medication. (Tr. 1112, 1124). Emergency room records from April 2017 reflect that plaintiff "ambulated" into the emergency room and do not report any abnormalities in her gait or difficulty walking. (Tr. 1044-48). Dr. Beresh's treatment notes from April 16, 2017 to September 6, 2017 report that plaintiff had an "irregular gait," but his notes do not elaborate on this finding and do not suggest that plaintiff lacked the ability to ambulate effectively. To the contrary, notes from each of the same dates also report that plaintiff had a "normal station," a "normal tandem gait test," and she was "ambulating normally." (Tr. 1107-1148).

Thus, substantial evidence supports the ALJ's finding that plaintiff's spinal impairments did not meet the requirements of Listing 1.04C. The medical records do not show that plaintiff experienced "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." 20

26

C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). The record indicates that plaintiff

retained "the capability to "sustain[] a reasonable walking pace over a sufficient distance to be

able to carry out activities of daily living" and "the ability to travel without companion assistance

to and from" a job. *Id.*, § 1.00(B)(2)(b)(2).

The ALJ did not err by failing to sufficiently articulate the basis for his determination that

plaintiff's impairments do not meet Listing 1.04. The ALJ stated that he considered Listings

1.04A and 1.04C, and he explained the reasons that he found plaintiff's spinal impairments did

not satisfy these listings. The ALJ's step three finding, viewed in the context of his written

decision and the medical record as a whole, is substantially supported. Plaintiff's first

assignment of error should be overruled.

## 2. Weight to the treating psychiatrist's opinions (Third assignment of error)[4]

For her third assignment of error, plaintiff alleges the ALJ erred by failing to give

"controlling" weight to the opinions of her treating psychiatrist, Dr. Michael Cerullo, M.D., at

Access Counseling Services (Access Counseling), and instead giving his opinions weight that

ranged from "little" to "significant." (Doc. 10 at 15-19).

### a. *Standard for evaluating medical opinions*

It is well-established that the findings and opinions of treating physicians are entitled to

substantial weight. "In general, the opinions of treating physicians are accorded greater weight

than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*,

127 F.3d 525, 529-30 (6th Cir. 1997). "Treating-source opinions must be given 'controlling

---

[4] The Court has considered plaintiff's second and third assignments of error in reverse order.

weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)).

If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must determine the weight the opinion should be given based on a number of factors, including the length, nature and extent of the treatment relationship and the frequency of examination, as well as the medical specialization of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6); *Gayheart,* 710 F.3d at 376.

"Importantly, the Commissioner imposes on [the SSA's] decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011); 20 C.F.R. § 404.1527(c)(2). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole,* 661 F.3d at 937 (citing SSR 96-2p).

Generally, an opinion from a medical source who has examined a claimant is given more weight than that of a source who has not performed an examination. *Id.* (citing 20 C.F.R. §§ 404.1502 and 404.1527(c)(1)). Opinions from nontreating and nonexamining sources are weighed based on the examining relationship, specialization, consistency, and supportability as

well as other factors "which tend to support or contradict the opinion." 20 C.F.R. §
416.927(c)(6). "[T]he opinions of State agency medical and psychological consultants and other
program physicians and psychologists can be given weight only insofar as they are supported by
evidence in the case record[.]" SSR 96-6p, 1996 WL 374180 at *2.

Plaintiff argues that the ALJ should have given the opinion of Dr. Cerullo "great, if not
controlling, weight" because his opinion is (1) consistent with his own treatment notes, and (2)
consistent with the substantial evidence of record. (*Id*. at 18). Plaintiff contends that this
evidence shows she suffers from depression, anxiety, PTSD, and a personality disorder with
symptoms of fatigue, poor insight and judgment, problems concentrating, racing thoughts,
excessive worry, panic attacks, irritability, flashbacks, anxious/fearful thoughts, feelings of guilt,
diminished interest or pleasure, insomnia, and suicidal thoughts. (Doc. 10 at 17-18, citing Tr.
451, 455, 460, 464, 556, 560, 583, 687-88, 698, 726, 738, 750-60, 763, 768, 915, 953, 1001).

Plaintiff alleges that even if Dr. Cerullo's opinion is not entitled to controlling weight, the
ALJ erred by failing to discuss any of the regulatory factors that must be evaluated in deciding
what weight to give the treating source's opinion, including the nature and extent of treatment,
specialization, and diagnostic findings. (*Id*. at 18-19, citing 20 C.F.R. § 404.1527(c)(2)-(6);
Social Sec. Ruling 96-2p, 1996 WL 374188, at *5 (1996)). Plaintiff argues that Dr. Cerullo
treated her for a "significant period of time" and "was able to make determinations about
[plaintiff's] ability to sustain employment" based on (1) his clinical examinations; (2) objective
testing; and (3) the reports of other treating medical sources. (*Id*. at 19). Plaintiff argues that the
ALJ did not recognize "consistencies throughout the record" and "cherry-pick[ed]" the record by

disregarding "selected opinion evidence based on his lay opinion of [plaintiff's] limitations and abilities." (*Id.* at 17, citing *Gentry v. Comm'r*, 741 F.3d 708, 724 (6th Cir. 2014) (citing *Minor v. Comm'r*, 513 F. App'x 417, 435 (6th Cir. 2013); *Germany-Johnson v. Comm'r*, 313 F. App'x 771, 777 (6th Cir. 2008) (ALJ erred where he "selectively 'pars[ed] the various medical reports")). Plaintiff alleges that the ALJ's analysis is not sufficiently meaningful and specific to allow subsequent reviewers to understand his erroneous discussion of the treating psychiatrist's opinion. (*Id.* at 19).

### b. Dr. Cerullo's opinions

Dr. Cerullo issued four opinions of plaintiff's mental functioning and ability to work. First, Dr. Cerullo completed a Mental Status Questionnaire on March 4, 2016, after he had seen plaintiff one time. (Tr. 710-12). He found that she was well-groomed and her mood was depressed, she had severe anxiety and negative thoughts, she was oriented times four, her cognitive functioning was "diminished," and her insight was fair. He diagnosed her with major depressive order but did not indicate the duration of her impairment. He opined that plaintiff was capable of managing any benefits that may be due. Dr. Cerullo described plaintiff's ability to remember, understand and follow directions as "intact." He opined that she was "limited" in her ability to maintain attention, sustain concentration, persist at tasks, complete tasks in a timely manner, interact socially, and adapt. Dr. Cerullo believed plaintiff would react "poorly" to pressures in a work setting or elsewhere involving simple and routine or repetitive tasks. (Tr. 710-12).

Second, Dr. Cerullo completed a "Medical Source Statement" on March 18, 2016, after

he had seen plaintiff twice. (Tr. 818-20). He opined that plaintiff had "mild" limitations in her

ability to understand, remember, and carry out simple instructions; "moderate" limitations in her

ability to make simple work-related decisions; and "marked" limitations in her ability to

understand, remember, and carry out complex instructions and make complex work-related

decisions. Dr. Cerullo identified the source of her limitations as "[c]ognitive symptoms related

to depression such as poor focus and memory." Dr. Cerullo opined that plaintiff's depression

and anxiety led to "marked" limitations in her ability to interact appropriately with the public,

supervisors, and coworkers and to respond appropriately to usual work situations and changes in

a routine work setting. (Tr. 818-20).

Third, Dr. Cerullo gave the following opinion in a letter dated May 3, 2016:

[Plaintiff] suffers from depression and anxiety and if employed would require
accommodations for these conditions. Upon employment, I would be happy to
help suggest specific accommodations that would be appropriate for that
employment.

(Tr. 822).

Finally, Dr. Cerullo wrote a letter dated September 10, 2016 "in support of [plaintiff's]

disability claim." (Tr. 826). Dr. Cerullo wrote that plaintiff's diagnoses were major depressive

disorder, PTSD, and anxiety disorder and she also had suffered a traumatic brain injury in 2014.

Dr. Cerullo opined that plaintiff's conditions currently "make it difficult for her to be around

people and she also has significant cognitive effects on her short term memory and

concentration." He concluded: "I believe she is currently unable to work and these conditions

will last for at least the next 12 months." *Id.*

The ALJ partially credited Dr. Cerullo's March 4, 2016 assessment that plaintiff's ability to remember, understand, and follow directions was "intact"; her ability to maintain attention, sustain concentration, persist at tasks, complete tasks in a timely manner, interact socially, and adapt was "limited"; and plaintiff would respond "poorly" to pressures associated with simple and routine or repetitive tasks in the work setting or elsewhere. (Tr. 24, citing Tr. 710-12). The ALJ also partially credited Dr. Cerullo's second assessment issued just two weeks later on March 18, 2016, insofar as Dr. Cerullo opined that plaintiff was "mildly limited" in her ability to understand, remember, and carry out simple instructions; however, the ALJ dismissed Dr. Cerullo's assessment of plaintiff as "markedly limited" in her ability to interact with others. (Tr. 24, citing Tr. 818-20). The ALJ dismissed Dr. Cerullo's May 2016 opinion that plaintiff could work if provided unspecified accommodations because he found it had "little probative value." (Tr. 24). The ALJ also rejected Dr. Cerullo's September 2016 opinion that plaintiff was unable to work due to her mental impairments and symptoms resulting from a traumatic brain injury she sustained in 2014. (Tr. 25). The ALJ found that while the record showed plaintiff had some "interactive difficulties and concentrative deficits," there was no evidence that these issues were work preclusive and no intellectual testing in the record to document purported cognitive deficits. (Tr. 25). The ALJ rejected Dr. Cerullo's assessment of debilitating limitations because plaintiff's session notes and the treating source assessments showed that plaintiff was "neither 'homebound' nor unable to handle stress or follow instructions." (Tr. 24).

The ALJ did not err in evaluating Dr. Cerullo's opinions. First, the ALJ was not required to give Dr. Cerullo's opinion that plaintiff had marked or extreme impairment in any area of

functioning controlling weight. Dr. Cerullo did not consistently assess plaintiff with this level of impairment. Dr. Cerullo opined at various times that plaintiff had the following degrees of limitations:

- She is "markedly limited" in her ability to understand, remember, and carry out complex instructions and to make judgments related to complex work-related decisions (Tr. 818)

- She is "limited" in her ability to interact socially and adapt (Tr. 711)

- She is "markedly limited" in her ability to interact appropriately with the public, supervisors, and co-workers (Tr. 819)

- She is "markedly limited" in her ability to respond appropriately to usual work situations and changes in a routine work setting (Tr. 819)

- Her ability to remember, understand and follow directions is "intact" (Tr. 711)

- She is "limited" in her ability to maintain attention, sustain concentrations, persist at tasks, and complete them in a timely manner (Tr. 711)

- She is "unable to work" due to major depressive disorder, PTSD, anxiety disorder, and "the significant cognitive effects of a traumatic brain injury in 2014 (Tr. 826)

- She would react poorly to pressures in a work setting or elsewhere involved in simple and routine, or repetitive tasks (Tr. 711)

- She is able to work if provided appropriate accommodations (Tr. 822).

The ALJ did not erroneously evaluate the evidence in light of the discrepancies in Dr. Cerullo's assessments and determined which opinions were supported by his treatment records and were consistent with the other evidence of record. The ALJ did not erroneously "cherry-pick" the record or otherwise err by giving "significant" weight to only some of Dr. Cerullo's opinions and discounting others. *See Solembrino v. Astrue*, No. 1:10-cv-01017, 2011 WL 2115872, at *8 (N.D. Ohio May 27, 2011) (an ALJ "does not 'cherry pick' the evidence merely

by resolving some inconsistencies unfavorably to a claimant's position."). Rather, the ALJ thoroughly considered the evidence in evaluating Dr. Cerullo's opinions. The ALJ's decision as to the weight to give those opinions is substantially supported.

First, the ALJ was not required to apply the treating physician rule to Dr. Cerullo's May 2016 opinion. "[A]pplication of the 'treating physician rule' is contingent upon a treating physician actually giving a medical opinion." *Rivera ex rel. H.R. v. Comm'r of Social Sec.*, No. 3:11-cv-163, 2012 WL 3562023, at *4 (S.D. Ohio Aug. 17, 2012) (Report and Recommendation), *adopted*, 2012 WL 3871944 (S.D. Ohio Sept. 6, 2012). The governing regulations define "medical opinions" as "assertions involving judgments about a patient's 'symptoms, diagnosis and prognosis'." *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007); *see* 20 C.F.R. § 404.1527(a)(1). Dr. Cerullo's letter stating that plaintiff could work if provided unspecified accommodations was not a medical opinion that the ALJ was required to weigh under 20 C.F.R. §§ 404.1527 and 416.927.

Second, the ALJ did not err by discounting Dr. Cerullo's September 2016 opinion that plaintiff was unable to work due to her mental impairments, including symptoms resulting from a purported traumatic brain injury she sustained in 2014. (Tr. 25). The ALJ found that the record showed plaintiff had some "interactive difficulties and concentrative deficits," but there was no evidence that these issues were work preclusive and no intellectual testing in the record to document purported cognitive deficits. (*Id.*). The ALJ also found that the record did not document a traumatic brain injury. (Tr. 25). Plaintiff has not pointed to objective findings that document debilitating interactive and concentration deficits. Further, the treatment records

confirm that plaintiff was not diagnosed with a traumatic brain injury after her motor vehicle accident, and plaintiff has not pointed to medical evidence that relates her mental health symptoms to a traumatic brain injury. (*See* Tr. 383-84- post-accident MRI results showed changes that are related to remote trauma in some cases). The ALJ reasonably discounted Dr. Cerullo's September 2016 opinion on this basis. (*See* Tr. 25).

Third, the ALJ did not err in discounting Dr Cerullo's two earlier opinions issued in March 2016. The ALJ gave only "some weight" to Dr. Cerullo's medical status questionnaire completed on March 4, 2016. (Tr. 24, citing Tr. 710-12). The ALJ partially credited the assessment to the extent Dr. Cerullo opined that plaintiff's ability to remember, understand, and follow directions was "intact," and her ability to maintain attention, sustain concentration, persist at tasks, complete tasks in a timely manner, interact socially, and adapt was "limited." (*Id.*). The ALJ credited Dr. Cerullo's second assessment issued just two weeks later on March 18, 2016, insofar as Dr. Cerullo opined that plaintiff was "mildly limited" in her abilities related to simple instructions; however, the ALJ dismissed Dr. Cerullo's assessment of "marked" limitations in her ability to interact with others and respond to work situations. (Tr. 818-20). The ALJ found that plaintiff's "session notes" and treating source assessments show that plaintiff was "neither 'homebound' nor unable to handle stress or follow instructions." (Tr. 24). The ALJ thoroughly considered the evidence and explained why he found portions of Dr. Cerullo's assessments to be supported and others to be unsupported by the extensive treatment notes and opinion evidence. The evidence of record substantially supports the ALJ's conclusion that Dr. Cerullo's opinions

are unsupported to the extent he assessed marked limitations in plaintiff's abilities to interact with others and handle pressure in ordinary work situations. (Tr. 712, 819).

The treatment records from Access Counseling lack medical signs and objective findings that corroborate Dr. Cerullo's assessment of marked limitations in these areas. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion."). Though plaintiff consistently reported symptoms of anxiety and depression to her care providers at Access Counseling, mental status findings were largely unremarkable and the treatment notes indicate that plaintiff was able to cope with stressors. (Tr. 720-815, 829-1001).

On mental status examination in October 2015, when plaintiff first began treating at Access Counseling, she was well-groomed, her demeanor was average and preoccupied, her speech was rapid, she had fair impulse control, her motor activity was restless, her thought process was logical, tangential and racing, her mood was anxious, irritable and dysthymic/depressed, her affect was anxious, her behavior/functioning was hyperactive, her intelligence was estimated to be average and her cognition was scattered, and her insight and judgment were fair. (Tr. 728-29). She was diagnosed with Attention-Deficit Hyperactivity Disorder (ADHD), Combined Presentation. (Tr. 730). At her first visit with Dr. Cerullo in February 2016, plaintiff's mood was depressed and her affect was sad, but the mental status findings were otherwise unremarkable. (Tr. 799-801). Plaintiff's appearance was well-groomed; her thought process was logical and goal-directed; she had no delusions or suicidal/homicidal ideation; she had experienced no hallucinations; she was alerted and oriented; her behavior was

36

cooperative; her insight was good; and her speech had a regular rate and rhythm. Plaintiff was diagnosed with major depressive disorder, recurrent, moderate. (*Id.*). Plaintiff was continued on Lamictal, which she had been prescribed recently, and Dr. Cerullo prescribed Lexapro. (*Id.*). He planned to decrease Lamictal if plaintiff did well on Lexapro. The nursing notes from that same visit report that plaintiff endorsed anxiety and depression that "was always present," but the remaining findings were unremarkable. (Tr. 798). When plaintiff next saw Dr. Cerullo on March 12, 2016, the objective findings were once again largely unremarkable. (Tr. 837). Plaintiff's mood was sad and her affect was depressed, but she was well-groomed, her thought process was logical and goal-directed, she was alert and oriented, her behavior was cooperative, and her insight was good. (Tr. 837-38).

The findings were similar in May 2016 (Tr. 822), shortly after Dr. Cerullo wrote his May 3, 2016 letter opining that plaintiff would require accommodations for her anxiety and depression if employed. (*See* Tr. 882). On September 10, 2016, the same date Dr. Cerullo opined that plaintiff was unable to work (Tr. 826), plaintiff's mood was sad and her affect was depressed, but there were no other abnormal objective findings. (Tr. 906). In December 2016, all objective signs were unremarkable: plaintiff's mood was good and her affect was euthymic, and plaintiff reported that she felt "like she is doing well, her mood is better, [and] she did well with Wellbutrin." (Tr. 938). There were no abnormal objective findings in February 2017. (Tr. 958). Plaintiff's mood was good and her affect was euthymic. (Tr. 958). She reported to the nurse on that same date that her mood was down and she felt that her current medication was not effective "mostly [due to] pain" from peripheral neuropathy, but plaintiff's dress, mannerism,

and speech were appropriate. (Tr. 961). In April 2017, plaintiff complained about a lot of anxiety and feeling more down and irritable due to pain as she waited to see a pain doctor, and her mood was sad and her affect was depressed, but all other objective findings were normal. (Tr. 970). In July 2017, plaintiff was sad and depressed but objective findings were otherwise normal. (Tr. 997).

In addition to the sparse objective findings in the treatment records, plaintiff's subjective complaints as reported in the treatment records do not reflect marked impairment in her abilities to interact with others, handle stress, or follow instructions. *See* Tr. 24, 25. Plaintiff's complaints centered on difficulties in her relationship with her partner/wife and other external factors, such as finances and physical complaints, and there is no indication that she was unable to deal with stress or that her mental health symptoms were debilitating. When first seen at Access Counseling in October 2015, plaintiff described limitations on her activities of daily living as "trauma related anxiety" and panic attacks, financial distress, personality differences and value conflicts contributing to escalating behaviors, and anger management issues and intimate relationship conflicts. (Tr. 723-30). Plaintiff reported to Dr. Cerullo in February that her mood was down and she had negative thoughts, including suicidal thoughts one week earlier but with no plan or intent. She reported that she felt bored as she stayed home and rarely left the house. She slept "OK" and took Klonopin as needed for sleep, which had been prescribed a few months earlier by her primary care physician, and it helped. (Tr. 799). Plaintiff lived with her partner, which was stressful because her partner had a bipolar disorder, and at times plaintiff stayed with a friend. (Tr. 800).

Shortly before Dr. Cerullo issued his assessment finding "marked" limitations in plaintiff's ability to interact with others, plaintiff reported to her counselor at Access Counseling, Ms. Patricia Peebles, LSW, that she was able to get along with others, she visited with friends on a weekly/biweekly basis, she relied on friends for transportation, and she was able to manage her finances and schedule. (Tr. 713-14). At another session on March 16, 2016, plaintiff indicated that she remained active, reporting she had been "able to walk for a few days this past week due to the nice weather" and she wanted to continue to work on "being more active with things and to follow up with YWCA," where she was eligible for financial assistance. (Tr. 842). Later in March, plaintiff reported she was "overwhelmed" with her "roommate's stolen identity and trouble with concentration of completing tasks," but she reported she was working on sketching and wanted to walk when the weather was nicer. (Tr. 848). In early April, plaintiff "expressed she is looking for some things to help people or strangers with." (Tr. 851). A nursing note dated March 12, 2016 indicates that plaintiff endorsed "anxiety" and "minor depression" and the only current stressor for her was "stress with her partner." (Tr. 839).

In May 2016, plaintiff reported "anxiety [and] depression that she said was manageable," and the only current stressor was her partner being in and out of the hospital. (Tr. 879). Plaintiff reported to Dr. Cerullo that she had "been feeling a little more down" after a rough month, but Klonopin helped with anxiety and sleep. (Tr. 882). In June 2016, plaintiff told her therapist that she was upset and anxious about the mass shooting in Orlando, Florida and she wanted to participate in a march in Columbus but her partner was unwilling to drive her there. (Tr. 889). In August 2016, plaintiff agreed to work on a schedule and on alone/together time with her

roommate to "get things done and maybe not be so anxious." (Tr. 898). Plaintiff complained of poor sleep due to her "roommate not allowing her to sleep well." In September 2016, plaintiff reported that "her mood is still OK but she mostly stays at home due to not having money and will watch TV." (Tr. 906). She was getting along with her partner and was planning on getting married. She noted more anxiety and trouble with forgetfulness and her memory. (*Id*.). In October 2016, plaintiff's stressors included finances, wedding planning, and her relationship with her brother. (Tr. 919). Plaintiff was worried at that time about a family friend with various medical issues who was like a "father" to her, and she was excited but worried about finances related to her upcoming wedding the following week. (*Id*.). In late October, plaintiff discussed problems with adjusting to her financial circumstances and her marital relationship. (Tr. 922). In December 2016, when Dr. Cerullo saw plaintiff for the first time since her marriage to her partner in September, plaintiff reported that her anxiety had increased because two friends had died in the last three weeks, but she was doing better overall, her mood was better, and her anxiety was under control. (Tr. 938). In February 2017, plaintiff reported to Dr. Cerullo that her mood was "OK" and that her antidepressant was "working well," but she was "still having conflict with her wife." (Tr. 958). In May 2017, plaintiff related stress with her living arrangements, possible eviction and/or having to get rid of her five "service/companion" dogs. (Tr. 979). Plaintiff was encouraged to identify social activities to engage in. (Tr. 979).

In addition, the treatment notes show that plaintiff was consistently cooperative with her mental health care providers and was able to participate in her treatment and follow instructions, which the ALJ reasonably found was inconsistent with the marked limitations and cognitive and

affective level of disability Dr. Cerullo assessed. (Tr. 24). In January 2016, plaintiff and Ms. Peebles "brainstormed" ways for plaintiff to focus on getting tasks completed, keeping track of issues, and following through with outcomes for applying for disability and for lab work and medical issues. (Tr. 783). Plaintiff expressed that she wanted to learn more about her lab results and determine a plan to make her feel better physically and less anxious. (*Id.*). In February 2016, plaintiff and her therapist discussed healthy coping skills to redirect frustrations. (Tr. 792, 795). In March 2016, they again "brainstormed coping skills to work thr[ough] some anxiety and depression as well as problem solving therapy." (Tr. 845). Plaintiff reported that she loved to paint and sketch, look on-line and surf the web for things being sold, read facebook, and watch television, and she acknowledged how too many electronics can cause insomnia. In April 2016, around the same time that Dr. Cerullo indicated plaintiff could work with some accommodations, plaintiff discussed how she had "gotten thr[ough] the funeral of a close friend" over the weekend and "was able to take the dogs for a walk"; she "continues to work on getting herself on more of a schedule to help improving her mood and functioning"; "she was able to sleep better after being outside with the dogs"; she wanted to follow up with Dr. Cerullo on that Friday about her medications; and she and the therapist brainstormed about ways plaintiff could work on decreasing her anxiety, such as by "painting, walking the dogs, and watching tv." (Tr. 856). Plaintiff told Ms. Peebles that she "was able to sleep better with walking or being outside on nice days." (*Id.*). On October 7, 2016, though plaintiff required redirection to focus on the topic of discussion, she was cooperative and receptive to prioritizing tasks that cause stress and open to practicing meditation/relaxation as a stress relief method. (Tr. 919). In late October, plaintiff

related that she had considered going to the hospital after a recent panic attack because "her medication was not effective in calming her immediately," and she discussed "use of relaxation which she stated kept her from having to go to the hospital." (Tr. 922). Plaintiff was receptive to the daily use of relaxation and to the "idea of journaling her thoughts and emotions as a means to develop understanding in her life." (*Id.*). Plaintiff also expressed an interest in having combined counseling sessions with her wife and followed up with a session of couple's therapy in November 2016. (Tr. 928-29). In May 2017, plaintiff's therapist helped plaintiff process thoughts and emotions related to her marriage and encouraged her to identify social activities to engage in, which plaintiff was "mildly receptive to," and to "acknowledge that as a result of her wife's mental illness the two may not always be able to do all the activities [plaintiff] would normally enjoy." (Tr. 979). Plaintiff's ability to interact appropriately with her providers, to accept and follow through on suggestions from her counselors, and to use relaxation techniques appears to be inconsistent with the marked degree of impairment Dr. Cerullo assessed in the functional areas of interacting with others, handling stress, and following instructions. (Tr. 24). The Access Counseling treatment notes thus support the ALJ's finding that though plaintiff had difficulties with her familial and personal relationships and some concentration deficits, the treatment records do not document "marked" impairment in her mental functioning. (Tr. 25, citing Tr. 826, 818-20; *see* Tr. 829-1001, 720-815).

The ALJ also reasonably determined that Dr. Cerullo's assessment of marked limitations is not substantially supported by the other mental health assessments and evidence of record, which the ALJ thoroughly evaluated in his written opinion. Contrary to plaintiff's

representation, Dr. Cerullo's assessment of marked and debilitating functional impairment was not consistent with the opinions and assessments of each treating therapist and examining psychologist. (Doc. 10 at 13-14). Plaintiff alleges that each of these sources imposed "significant" and "similar" work restrictions related to plaintiff's "limited ability to understand, remember and carry out instructions; sustain concentration, persistence, and pace; and interact with others." (*Id.* at 13). Each of the treating and examining mental health sources who evaluated plaintiff found she had severe mental impairments, but they assessed different degrees of mental functional impairment. The ALJ considered each of the assessments and reports and explained the reasons for the weight he assigned them. The ALJ's reasons are substantially supported by the record.

First, Dr. Cerullo's assessments were not consistent with the findings and reports of plaintiff's counselors at Access Counseling, which were issued within days of Dr. Cerullo's first assessment and less than one month before his second assessment. Ms. Peebles completed a Daily Activities Questionnaire on plaintiff's behalf after she had first seen plaintiff on January 6, 2016 and most recently on February 26, 2016. (Tr. 713-14). Plaintiff reported difficulty with recurrent panic attacks, trying to new learn programs, and getting very overwhelmed during attempts to return to work. Ms. Peebles reported that plaintiff is "extremely overwhelmed easily," and has difficulty with concentration and learning new tasks. Ms. Peebles did not document that plaintiff had issues interacting with others. According to the questionnaire, in her prior regular work, plaintiff could get along with other people but "prefers to stay away from problems." Plaintiff reported she visited with friends on a weekly/biweekly basis, she relied on

friends to assist her with transportation because she does not drive, and she managed her bills and her schedule. Thus, the questionnaire was not consistent with Dr. Cerullo's assessment of marked interactive difficulties.

In addition, Margie Braunstein, LSW, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on February 29, 2016, which the ALJ reasonably gave "little" weight on the grounds (1) she had only brief contact with plaintiff, and (2) a GAF[5] score of 55[6] which she assigned to plaintiff in January of 2016 not comport with the marked to extreme limitations she assessed. (Tr. 23; *see* Tr. 699). Ms. Braunstein found that plaintiff was significantly more limited than Dr. Cerullo assessed her to be in early March. (Tr. 717-19). Whereas Dr. Cerullo opined that plaintiff's ability to remember, understand and follow instructions was "intact" on March 4, 2016 (Tr. 711), Ms. Braunstein found just days earlier that plaintiff was "extreme[ly] limited" in her ability to understand and remember *simple* instructions and she had "marked" limitations in her ability to carry out simple instructions. (Tr. 717-19). Further, while Dr. Cerullo found in early March that plaintiff was "limited" to an unspecified degree in her ability to interact appropriately with others (Tr. 711), Ms. Braunstein found plaintiff had "marked" to "extreme" limitations in these areas. (Tr. 718). Dr. Cerullo also was

---

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *Id.* at 34. An update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Id.* (citing DSM V at 16) (5th ed., 2013)).

[6] A GAF of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006).

of the opinion plaintiff could manage benefits in her best interest in March (Tr. 711), whereas Ms. Braunstein did not believe she could. (Tr. 719).

Thus, contrary to plaintiff's allegation, Dr. Cerullo's opinion was not wholly consistent with the assessments of plaintiff's counselor's at Access Counseling. Further, Dr. Cerullo's opinions were only partially consistent with the assessment of Dr. Nancy Schmidtgoessling, Ph.D., who evaluated plaintiff for disability purposes on September 17, 2015. (Tr. 578-88). To the extent their assessments were consistent, the ALJ largely credited them. The ALJ adopted their findings that plaintiff "would do best on simple, repetitive tasks due" to some "difficulty remaining focused"; she "may display interactive deficits"; and she "may display . . . some limitations in her ability to tolerate day-to-day work."[7] (Tr. 27-28, citing Tr. 578-588). Plaintiff has not shown that the ALJ erred by rejecting other portions of Dr. Cerullo's opinions that were consistent with Dr. Schmidtgoessling's findings.

Finally, Dr. Cerullo's assessment was not entirely consistent with the assessment of the non-examining state agency psychologists, which the ALJ gave "some" weight. (Tr. 29). The reviewing psychologists found in October 2015 and March 2016 that plaintiff had only mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning

---

[7] The ALJ gave "weight" to Dr. Schmidtgoessling's opinion, which plaintiff alleges was error because the amount of weight was not specified. (Doc. 10 at 14-15). However, the cases plaintiff cites involve the treating physician rule, which does not apply to the consultative examining psychologist. *See Reagan v. Colvin*, 47 F. Supp. 3d 648, 652 (E.D. Tenn. 2014) (the ALJ did not comply with the treating physician rule by failing to determine the weight, if any, assigned to the treating physician's opinion and the reasons for the weight assigned); *Shlimon v. Comm'r. of Soc. Sec.*, No. 12-13806, 2013 WL 3285136, at *16 (E.D. Mich. June 28, 2013) (the ALJ failed to adequately articulate why he rejected the treating physician's opinion). Because Dr. Schmidtgoessling examined plaintiff only once, her opinion is entitled to no special deference. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Further, the ALJ made clear which portions of Dr. Schmidtgoessling's opinion he found to be supported and that he adopted. (Tr. 29).

and concentration, persistence, or pace. (Tr. 97, 136). They assessed plaintiff as able to understand and recall simple 1-2 step tasks; to sustain attention, concentration, persistence and pace to perform routine tasks that do not have fast paced performance or strict production quota requirements; to interact briefly and occasionally in situations that do not require more than superficial contact, resolving conflicts, or working directly with the general public; and to work in an environment where duties are fairly static and changes can be easily explained. (Tr. 101-03, 140-42). The ALJ assigned "some" weight to the assessments of the state agency psychologists on the grounds the assessments were consistent with plaintiff's GAF scores and with the record evidence as a whole. (Tr. 29). The ALJ reasonably relied on the non-examining psychologists' opinions to impose restrictions that were not necessarily consistent with the limitations assessed by Dr. Cerullo. *See* 20 C.F.R. §§ 404.1527(e), 416.927(e); *Wisecup v. Astrue*, No. 3:10-cv-00325, 2011 WL 3353870, at *7 (S.D. Ohio July 15, 2011) (Report and Recommendation), *adopted*, 2011 WL 3360042 (S.D. Ohio Aug. 3, 2011) ("opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight").

Thus, the ALJ's decision to afford Dr. Cerullo's opinions less than controlling weight is substantially supported by the evidence. The ALJ thoroughly examined the evidence and explained why the evidence did not support Dr. Cerullo's assessment of marked and debilitating mental limitations. Plaintiff's third assignment of error should be overruled.

### 3. The ALJ's mental RFC finding

For her second assignment of error, plaintiff alleges the ALJ erred in formulating a mental RFC that is not supported by substantial evidence. Plaintiff argues that the ALJ "played doctor" by substituting his lay opinion and interpretation of the evidence for the opinions of the mental health sources, which plaintiff alleges are similar and support a more restrictive RFC. Plaintiff also alleges that the ALJ "cherry-pick[ed]" the record by selecting the portions of the evidence that supported the ALJ's opinion and disregarding the evidence that did not. (*Id.* at 13-15). She contends that the RFC for sedentary work with additional limitations is "inaccurate, unclear and based on the ALJ's lay opinion," and thus fails to fully address her limitations stemming from her mental impairments. (*Id.* at 12). Plaintiff alleges the record consistently documents her mental health symptoms. (Doc. 10 at 13, citing Tr. 451, 455, 460, 464, 556, 560, 583, 687-88, 698, 726, 738, 750-60, 763, 768, 915, 953, 1001).

For the reasons explained in connection with plaintiff's second assignment of error, plaintiff has not accurately characterized the record. Each of the treating, examining, and non-examining mental health sources who evaluated plaintiff found she had severe mental impairments, but they assessed different degrees of mental functional limitations. It was not necessary that the ALJ's RFC finding "correspond to a particular physician's opinion." *Tucker v. Comm'r of Soc. Sec.*, No. 18-2300, 2019 WL 2418995, at *5 (6th Cir. June 10, 2019) (quoting *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (rejecting the argument that the ALJ must base his determination on a physician's opinion)). The ALJ was required only to "make a connection between the evidence relied on and the conclusion reached." *Id.* The ALJ

did so. The ALJ thoroughly considered each of the assessments and reports of plaintiff's mental functioning, together with the other extensive evidence of record, and he articulated his rationale for his RFC finding. The ALJ built a "logical bridge" between the opinion evidence and other record evidence and the RFC finding, which restricted plaintiff to "simple, routine tasks involving no more than simple work-related decisions"; "frequent rather than constant interaction with the general public"; and "few changes in her routine work setting." (Tr. 20). Plaintiff has not identified additional mental restrictions that are supported by the evidence which the ALJ was required to include in the RFC finding. The ALJ's mental RFC finding is supported by substantial evidence.

Plaintiff's second assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this case be closed on the docket of the Court.

Date: 8/20/19

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

KRISTI ASBURY,
    Plaintiff,

       vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-365
Dlott, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).